## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MASTR Asset Backed Securities Trust 2006-
HE3, by U.S. BANK NATIONAL
ASSOCIATION, solely in its Capacity as the
Trustee pursuant to a Pooling And Servicing
Agreement, dated as of August 1, 2006,

        Plaintiff,

      v.

WMC MORTGAGE CORPORATION and
EQUIFIRST CORPORATION,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT AND JURY DEMAND**

__ Civ. _____

Plaintiff MASTR Asset Backed Securities Trust 2006-HE3 (the "Trust"), by U.S.

Bank National Association ("U.S. Bank" or the "Trustee"), solely in its capacity as the

Trustee for the holders of, and at the direction of certain holders of, Mortgage Pass-

Through Certificates Series 2006-HE3 (the "Certificates") issued by the Trust pursuant to

a Pooling and Servicing Agreement dated as of August 1, 2006 ("PSA"), by its attorneys,

Kasowitz, Benson, Torres & Friedman LLP, as and for its complaint against defendants

WMC Mortgage Corporation ("WMC") and EquiFirst Corporation ("EquiFirst," together

with WMC, "Defendants"), states and alleges as follows:

### Preliminary Statement

   1.   This is an action for breach of contract arising out of the failure by WMC

and EquiFirst (collectively, the "Originators") to repurchase certain defective loans from

a pool of home mortgage loans originated by the Originators (the "Mortgage Loans" or "Loans") that were sold to the Trust in connection with the securitization of the Loans through the issuance of over $550 million of Certificates (the "Securitization").  The Originators sold the Mortgage Loans to UBS Real Estate Securities Inc. ("UBS"), and UBS thereafter sold the Loans, and assigned all of its rights in those Loans, to the Trust.

2.      At the time that the Originators sold the Mortgage Loans to UBS, they made various representations and warranties regarding those Loans, including the representations that:  (a) no fraud, error, misrepresentation, or gross negligence with respect to each Mortgage Loan had taken or would take place on the part of the Originators or mortgagors (the "No Fraud Clause"), and (b) each Mortgage Loan complied with the Originators' own underwriting requirements (the "Underwriting Standards").  The No Fraud Clause and the Underwriting Standards were meant to ensure that the Mortgage Loans met an agreed-upon level of creditworthiness and that the information provided by the Originators regarding those Loans was true and accurate for the purposes of, among other things, rating agencies' assignment of credit ratings to the Certificates and the payment of principal and interest on those Certificates.

3.      Subsequent investigations have revealed that the Originators' representations were false when made.  A sample of the Mortgage Loan files, selected by Plaintiff, contains numerous borrower misrepresentations, made as of the origination date of each respective Loan, which is in direct violation of the No Fraud Clause and/or the Underwriting Standards.  Plaintiff has compelling reason to believe that the vast majority of the other Mortgage Loans in the Trust likewise violate the No Fraud Clause and/or the

2

Underwriting Standards, as well as other representations and warranties made by the Originators. These contractual violations have materially adversely affected the value of the Mortgage Loans and the Certificates.

4. The contracts governing the Trust provide Plaintiff, as Trustee, with a specific remedy for the Mortgage Loans identified by Plaintiff that were originated by one of the Originators and that violate the Originator's representations and warranties (the "Defective Loans"): upon notice and a failure to cure, the Originators are required to repurchase such Defective Loans. Nonetheless, despite the Originators' misrepresentations and clear contractual breaches with respect to the Defective Loans – as well as the written notices that have been provided to the Originators regarding those misrepresentations and breaches – the Originators have refused to comply with their obligation to repurchase such Loans. Based on the overwhelming number of defects and the Originators' blanket refusal to repurchase the Defective Loans, Plaintiff has a good faith basis to believe that the Originators will refuse to repurchase *any* Mortgage Loans that violate the Originators' contractual representations and warranties. The Trust has suffered and will continue to suffer damages as a result of the Originators' refusal to abide by their repurchase obligations.

5. The PSA, a true and correct copy of which is attached hereto as Exhibit 1, expressly authorizes the Trustee to enforce the rights of the Trust. Further, Section 2.03 of the PSA specifically provides that the Originators' repurchase obligations arise – and shall be enforced by the Trustee − where a breach of a representation or warranty "materially adversely affects the value of [the associated] Mortgage Loan or the interest

therein of the Certificateholders…." As discussed in detail below, the Originators' breaches of their representations and warranties have had a material adverse effect on the Defective Loans, likely a vast majority of Mortgage Loans in the Trust, and ultimately, the Certificates. Accordingly, the Trustee has standing to commence this action to compel specific performance of the Originators' obligations or, alternatively (if specific performance is for any reason unavailable), recover damages from the Originators for the over $200 million in losses they have likely caused to the Trust.

## PARTIES

6.     Plaintiff U.S. Bank is a national banking association with its principal place of business in St. Paul, Minnesota.

7.     Upon information and belief, Defendant WMC is a corporation organized under the laws of the State of Delaware, with its principal place of business in Burbank, California.

8.     Upon information and belief, Defendant EquiFirst is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), in that there is complete diversity among the parties and the amount in controversy exceeds $75,000.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, because Defendants are subject to personal jurisdiction in this district.

# FACTUAL ALLEGATIONS

## I.   The Securitization

11.   The Securitization of the subject Mortgage Loans was effectuated through a series of agreements executed in or about August 2006.  On or about August 30, 2006, WMC, EquiFirst, UBS, and Mortgage Asset Securitization Transactions, Inc. ("MASTR"), among others, entered into written contracts known as the Assignment and Recognition Agreements (the "Assignment Agreements") in which UBS agreed to convey all right, title and interest in the Mortgage Loans to MASTR.  (Forms of the Assignment Agreements (the "WMC Assignment" and the "EquiFirst Assignment") are attached as Exhibit D to the PSA.)

12.   UBS had obtained its interests in the Mortgage Loans pursuant to master seller's purchase and warranties agreements (the "Purchase Agreements") with the Originators.  In the Purchase Agreements, the Originators agreed to sell, and UBS agreed to purchase, certain mortgage loans and the related servicing rights.

13.   The Purchase Agreements entitled UBS to seek from the Originators the repurchase of any Mortgage Loan that violated the Originators' representations and warranties – including those in Sections 3.01 and 3.02 of the Purchase Agreements – and was not cured.  Thereafter, in the Assignment Agreements, the Originators agreed that the Trust, and not UBS, would be the owner of the Mortgage Loans and that "the Trust (including the Trustee and the Servicer acting on the Trust's behalf) shall have all the rights and remedies available to [UBS], insofar as they relate to the Mortgage Loans, under the Purchase Agreement[s], including, without limitation, the enforcement of the

document delivery requirements and remedies with respect to breaches of representations

and warranties set forth in the Purchase Agreement, and shall be entitled to enforce all of

the obligations of [WMC and EquiFirst] thereunder insofar as they relate to the Mortgage

Loans….” *See* Assignment Agreements at 1.

14.     In addition, as part of the Assignment Agreements, the Originators

represented and warranted, for the benefit of the Trust, among other things, that the

representations and warranties set forth in Sections 3.01 and 3.02 of the Purchase

Agreements were true and correct.  *See id*. at 2, Schedule 1 (attaching the representations

and warranties).  The Assignment Agreements also provide that “all references to [UBS]

(insofar as they relate to the rights, title and interest and, with respect to obligations of

[UBS], only insofar as they relate to the enforcement of the representations, warranties

and covenants of [the Originators]) or the Custodian under the Purchase Agreement[s]

insofar as they relate to the Mortgage Loans, shall be deemed to refer to the Trust

(including the Trustee and the Servicer acting on the Trust’s behalf).”  *Id.* at 1-2.  Further,

under the terms of the Assignment Agreements, the Originators explicitly acknowledged

that MASTR would thereafter transfer the Mortgage Loans and all rights created by the

Purchase Agreements to the Trust, and that the Assignment Agreements “shall inure to

the benefit of … the Trust (including the Trustee and the Servicer acting on the Trust’s

behalf.” *See id.* at 4.

15.     Also on or about August 1, 2006, MASTR, as Depositor; HomEq, as

Servicer; Wells Fargo Banks, N.A., as Master Servicer, Trust Administrator and

Custodian (“Wells Fargo”); and US Bank, as Trustee, entered into the PSA, which

provided for the creation of the Trust and the pooling and servicing of the Mortgage Loans for the purpose of selling over $550 million of Certificates to investors (the "Certificateholders").  In the PSA, MASTR agreed to "transfer, assign, set over and otherwise convey to the Trustee without recourse, for the benefit of the Certificateholders, all the right, title and interest of [MASTR] … in and to the Mortgage Loans … [and] the rights of [MASTR] under the Assignment Agreements…."  Exhibit 1, § 2.01.

16.     The PSA also provided that, upon receiving written notice from MASTR, the Servicer or Wells Fargo of either defective or missing documentation in the Mortgage Files or of the breach by the Originators of any representation, warranty, or covenant under the Assignment Agreements or Purchase Agreements "in respect of any Mortgage Loan that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," the Trustee shall request that the Originator of that Loan cure such breach within ninety (90) days.  *See* Exhibit 1, § 2.03(a).

17.     The PSA further provided that if the Trustee receives written notice from MASTR, the Servicer or Wells Fargo that the Originator "has not delivered such missing document or cured such defect or breach in all material respects during such [90 day] period, the Trustee shall enforce the obligations of such Originator **…** as applicable, under the related [Purchase] Agreement or Assignment Agreement to repurchase such Mortgage Loan…."  *See id.*, § 2.03(a).

18.     Accordingly, after the lapse of the 90-day cure period, Plaintiff, as Trustee, has the right to enforce the obligations of the Originators to remedy material breaches in

their representations and warranties by compelling those Originators to repurchase the Defective Loans.

## II.     The Originators' Misrepresentations And Breaches

### A.     The Originators' Representations And Warranties Regarding The Origination And Sale Of The Mortgage Loans

19.     As noted, under the terms of the Assignment Agreements, the Originators made extensive representations and warranties about the Mortgage Loans and the accuracy of the information that the Originators provided with respect to those Loans. *See*, *e.g.*, Assignment Agreements, Schedule 1, § 3.02.  These representations and warranties included:  (a) the No Fraud Clause – *i.e.*, that no fraud, error, misrepresentation, or gross negligence with respect to each Mortgage Loan had taken or would take place on the part of the Originators, the mortgagors or "any other party" involved in the origination of the Mortgage Loan (*id.*, § 3.02(k)), as to EquiFirst, the representation as to "any other party" was to the best of its knowledge); (b) that each Mortgage Loan would be originated in accordance with the Underwriting Standards; and (c) that the Originators had employed a methodology that utilized objective criteria designed to determine that each borrower had the ability to repay (*see* WMC Assignment, Schedule 1, § 3.02(iii); EquiFirst Assignment, Schedule 1, § 3.02(lll)).  Recent investigations have revealed that these and many other of the Originators' representations were false.

20.     On or about April 14, 2010, in accordance with Section 2.03 of the PSA, Recovco Mortgage Management, LLC ("Recovco"), acting on behalf of a majority of the

voting Certificateholders, began an investigation into the Mortgage Loans in the Trust by requesting that Wells Fargo, as the Trust Administrator, obtain a sample of the loan files for those Loans.  Wells Fargo did so, and on or about July 28, 2010, upon completion of its review of the 200 sample files, Recovco identified material breaches of the Originators' representations and/or warranties in 150 out of the 200 Mortgage Loan files, amounting to a stunning 75 percent failure rate.

21.     On or about August 5, 2010, Recovco notified Wells Fargo of its findings. On or about August 27, 2010, Wells Fargo sent a notice of claim letter to the Trustee, whereupon the Trustee notified the Originators of Recovco's identified breaches and requested that the Originators cure those breaches.  The Originators' 90-day cure period expired on December 17, 2010, with the Originators repurchasing not a single loan.

22.     Indeed, since December 2010, the Originators have refused to comply with their contractual obligations, even upon receipt of the Trustee's May 20, 2011 letter, which included a report setting forth in significant detail the specific breaches associated with each identified Defective Loan (the "Report").  As stated in the Report, the Defective Loans contained materially adverse breaches of a number of the Originators' representations and warranties including the fact that:  (a) fraud, errors, misrepresentations, or gross negligence was readily apparent from the Mortgage Loan files; (b) the Mortgage Loans failed to comply with the Underwriting Standards, including mandated employment, income, mortgage loan-to-value and primary residency requirements; (c) significant documentation was missing; and/or (d) the Originators had failed to utilize a methodology in underwriting the loans that employed objective

9

mathematical principles designed to determine that, at the time of origination, the borrowers had the ability to make timely payments on the Mortgage Loans.

23.    In addition to identifying breaches of representations and warranties with respect to specific loans, the Report also demonstrated a systemic failure by the Originators to apply sound underwriting standards and practices, which Plaintiff believes cuts across all of the approximately 3067 Mortgage Loans in the Trust. For example, as to 55 of the 150 Defective Loans, Recovco discovered misrepresentations of income and/or employment by the borrower, the large majority of which could have been discovered by the Originators prior to transfer through simple diligence procedures. As to 12 of the 150 Defective Loans, Recovco discovered misrepresentations of occupancy by the borrower, another factor that could easily have been verified by the Originators. In addition, 72 of the 150 Defective Loans contained multiple defects, further evidencing a complete lack of originating diligence.

24.    For instance, one of the Defective Loans, originated by WMC, was plagued with misrepresentations of the borrower's income, debt liabilities and occupancy status. In particular, whereas the borrower stated on his loan application that he earned $14,782 per month performing "account analysis," the borrower's income tax returns for the 2005 and 2006 years made it unambiguously clear that he was a taxi driver with a monthly income of only $1,548. Further, the borrower's credit report disclosed two additional mortgages in the amount of $435,000, or an additional monthly liability of $3,094, which the borrower failed to disclose on his loan application. Finally, contrary to the borrower's representations, the property he sought to purchase with the loan in question

10

was not the borrower's primary residence, and as a result, the rental obligations of the borrower's actual primary residence added another $2,200 of monthly debt liabilities. In sum, if the borrower's characteristics were viewed in a true and accurate light, the borrower's debt to income ratio ("DTI") – a critical measure of the borrower's creditworthiness and loan quality, whereby a mere 2-3 percent change requires re-evaluation of loan approval – rose from an acceptable 34.9 percent to an incredible 761.7 percent, far beyond the maximum of 55 percent DTI provided in the Underwriting Standards.

25. Another Mortgage Loan originated by WMC likewise contained numerous misrepresentations of the borrower's income, the co-borrower's income, and the borrower's undisclosed debt liabilities. Specifically, instead of her stated $9,200 monthly income as a billing manager, the borrower actually worked as an optometric technician, making $2,405 per month. Similarly, the co-borrower misrepresented his income and occupation to be $8,800, earned as a grade check, rather than the actual $2,843, earned as a laborer. Moreover, in the same month the borrower closed this loan, the borrower had also refinanced another, unrelated property, which increased her debt liabilities by over $100,000. The borrower's loan application did not reflect the refinancing and the associated DTI increase. Even without the additional debt obligation resulting from the refinancing, the borrower's actual DTI increased from a reasonable 31.7 percent to an impermissible 108.8 percent.

26. A Mortgage Loan originated by EquiFirst was similarly afflicted with borrower misrepresentations as to income, undisclosed debt liabilities and occupancy

status.  In particular, the borrower's employment and income as stated on the original

loan application, indicated that the borrower worked as a defense contract program

director, earning total monthly income of $13,250.  However, a subsequent verification

with the borrower's place of employment revealed that the borrower actually worked as

an associate, earning a monthly income of $9,019.  Further, the borrower was qualified

for the loan based on his total housing expense of $4,771 and total monthly obligations of

$1,710, resulting in total monthly liabilities of $6,481.37.  However, according to his

credit report and other public documents, the borrower had additional monthly debt

obligations in the amounts of $1,764, $1,408, $2,976, $2,301, $4,227, $647, $1,025, and

$1,190, which in aggregate added $15,538 to the borrower's debt obligations per month.

As a result of his lower income and higher debt obligations, the borrower's DTI rose

from an acceptable 48.9 percent to an unacceptable 244.1 percent.  Finally, although the

borrower had represented that the underlying property for the loan would be his primary

residence, public records demonstrate that the borrower did not occupy the subject

property as a primary residence and that two unrelated individuals had turned on the

utilities at the property – an indicator that the borrower utilized the subject property as a

rental.

27.     In each of these Defective Loans, borrower fraud regarding income,

occupancy status and outstanding debt obligations violated the Originators' No Fraud

Clause.  *See* Assignment Agreements, Schedule 1, § 3.02(k).  In addition, the fact that the

actual DTI of the borrower vastly exceeded the maximum 55 percent was a violation of

the Originators' Underwriting Standards.  *See id.* §3.02(q).  It is crystal clear that, upon

origination, the borrower's fraud and actual DTI destined each of these Mortgage Loans

for default.  In short, if the Originators had enforced the No Fraud Clause and abided by

their Underwriting Standards, they would not have originated these and other non-

conforming Loans and would have ultimately protected the Trust from the numerous

defaults and delinquencies that have arisen from the borrowers' inability to meet their

obligations.

28.    Indeed, at issuance, in August 2006, the Trust's original total loan balance

was $555 million from a total of 3,067 Mortgage Loans.  However, as of June 27, 2011,

over 45 percent − i.e., $257 million, or 1,374 Loans − of that loan balance had been

liquidated because of the pervasive fraud and misrepresentations in the loan applications.

Moreover, over 30 percent of the remaining Mortgage Loans in the pool are delinquent in

payment as of the date of this filing.

29.    The rapid downgrades of the most senior Certificates provide additional

support for the conclusion that the Originators' breaches have materially adversely

affected the value of the Mortgage Loans and the Certificates.  Upon their issuance in

August 2006, the senior Certificates initially bore the highest possible rating of AAA

from S&P, AAA from DBRS, and Aaa from Moody's; however, starting in or about

March 2008, their ratings plummeted, such that by the Summer of 2010, the senior

Certificates had a CCC rating from S&P, C from DBRS, and Ca from Moody's.  Each of

S&P's CCC rating, DBRS's C rating, and Moody's' Ca ratings indicates a high

likelihood of default and is only one level above payment default.  Neither these senior

Certificates, nor the more junior Certificates, would have ever received high credit ratings

had the Originators disclosed true and accurate information regarding each of the

Mortgage Loans.  Indeed, the Certificates would likely have never even issued.

30.     The excessive number of defaults and delinquencies in the Trust would

likely not have occurred if the Originators had abided by the No Fraud Clause and/or

followed the Underwriting Standards.  Instead, the massive underperformance of the

Mortgage Loans in the Trust is a clear indication that the Originators completely

disregarded their contractual representations and warranties; showed little, if any,

concern, for a borrower's ability to repay; and followed few, if any, objective standards

or criteria in underwriting the Loans.

**B.     The Originators' Bad Faith
        Refusal To Repurchase The Defective Loans**

31.     In response to the Report and the overwhelming evidence of the

underperformance of the Mortgage Loans in the Trust – underscoring the material

adverse affect of the Originators' breaches on the value of each Mortgage Loan and the

Certificates − the Originators have failed to repurchase the Defective Loans identified by

Recovco and refused even to consider the merits of the Trustee's repurchase requests.

32.     In fact, since the expiration of the 90-day cure period in December 2010,

the Originators have failed to cooperate with the Trustee.  EquiFirst has remained silent

and has done virtually nothing, while WMC has responded with flat out refusal to

recognize the breaches and underlying evidence provided by the Trustee.

33.     It is clear that the Originators seek one thing and one thing only − to avoid

their liabilities to the Trust – and will therefore refuse to repurchase *any* Mortgage Loan

in the Trust that violates their contractual representations and warranties.  As a result of

the Originators' breaches, the Trust has suffered significant losses, in an amount likely in

excess of $200 million. Unless the Originators perform their obligations, the value of the

Trust and, ultimately, the Certificates will continue to deteriorate.

## FIRST CAUSE OF ACTION

### Breach of Contract/Specific Performance

### (Against WMC and EquiFirst)

34.     The Trustee incorporates by reference the allegations set forth in

paragraphs 1 through 33, inclusive, of this Complaint as though set forth fully herein.

35.     WMC and EquiFirst have breached their contractual obligations under the

PSA, the Purchase Agreements and the Assignment Agreements to cure and/or

repurchase the Defective Loans.  The PSA, the Purchase Agreements and the Assignment

Agreements are valid and enforceable contracts that give rise to certain obligations on the

part of WMC and EquiFirst with respect to the Mortgage Loans.

36.     On or about August 27, 2010, in accordance with § 2.03 of the PSA, Wells

Fargo notified the Trustee of the breaches of WMC and EquiFirst's representations and

warranties that materially adversely affected the value of the Mortgage Loans and the

Certificates.  In turn, the Trustee notified the Originators of their obligation to cure those

breaches, thereby triggering the ninety (90) day cure period provided by § 2.03.

37.     Over ninety (90) days have passed since WMC and EquiFirst were notified

of their breaches.  As of the date of this filing, WMC and EquiFirst have failed and

refused, and continue to fail and refuse, to perform their obligations under the PSA − in

particular, to repurchase the Defective Loans and cure missing or defective

documentation.  The Trustee has adequate notice of these refusals to repurchase.

38.     The Trustee, acting on behalf of the Trust, is entitled to specific

performance of WMC and EquiFirst's obligations under the PSA, the Purchase

Agreements and the Assignment Agreements to repurchase the Defective Loans.

39.     Specific performance of these contractual obligations is required because

the applicable agreements specifically contemplate this remedy to address missing

documentation in the Mortgage Loan files and breaches by WMC and EquiFirst of their

representations and warranties that materially adversely affect the value of the Mortgage

Loans and the Certificates.  Moreover, the Trustee has no adequate remedy at law in that

it may be impossible to ascertain the precise amount of damages that the Trust has

incurred, and will incur in the future, as a result of WMC and EquiFirst's breaches.

40.     While, to date, 150 Defective Loans that were not properly underwritten by

WMC and EquiFirst have been discovered, there is good reason to believe that, as set

forth above, WMC and EquiFirst improperly represented, underwrote, or originated

hundreds of additional loans in the Trust, worth hundreds of millions of dollars.

41.     The Trustee has performed all conditions, covenants, and promises required

on its part to be performed in accordance with the terms and conditions of the subject

contracts.

42.     For all of these reasons, the Trustee is entitled to specific performance of

WMC and EquiFirst's contractual obligation to repurchase the Defective Loans identified

16

by the Trustee to date, as well as the rest of the non-conforming Mortgage Loans in the Trust.

## SECOND CAUSE OF ACTION

### Breach of Contract/Declaratory Judgment

### (Against WMC and EquiFirst)

43.     The Trustee incorporates by reference the allegations set forth in paragraphs 1 through 42, inclusive, of this Complaint as though set forth fully herein.

44.     WMC and EquiFirst have breached their contractual obligations under the PSA, the Purchase Agreements and the Assignment Agreements to cure and/or repurchase the Defective Loans.  The PSA, the Purchase Agreements and the Assignment Agreements are valid and enforceable contracts that give rise to certain obligations on the part of WMC and EquiFirst with respect to the Mortgage Loans.

45.     On or about August 27, 2010, in accordance with § 2.03 of the PSA, Wells Fargo notified the Trustee of the breaches of WMC and EquiFirst's representations and warranties that materially adversely affected the value of the Mortgage Loans and the Certificates.  In turn, the Trustee notified the Originators of their obligation to cure those breaches, thereby triggering the ninety (90) day cure period provided by § 2.03.

46.     Over ninety (90) days have passed since WMC and EquiFirst were notified of their breaches.  As of the date of this filing, WMC and EquiFirst have failed and refused, and continue to fail and refuse, to perform their obligations under the PSA − in particular, to repurchase the Defective Loans and cure missing or defective documentation.  The Trustee has adequate notice of these refusals to repurchase.

17

47.     While, to date, 150 Defective Loans that were not properly underwritten by WMC and EquiFirst have been discovered, there is good reason to believe that, as set forth above, WMC and EquiFirst improperly represented, underwrote, or originated hundreds of additional loans in the Trust, worth hundreds of millions of dollars.

48.     The Trustee has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the subject contracts.  A case and controversy exists among the Trustee, WMC and EquiFirst with respect to the Defective Loans and other non-conforming Mortgage Loans.

49.     For all of these reasons, the Trustee, acting on behalf of the Trust, is entitled to an order declaring that WMC and EquiFirst are obligated under the PSA, the Purchase Agreements and the Assignment Agreements to repurchase the Defective Loans identified by the Trustee to date, as well as the rest of the non-conforming Mortgage Loans in the Trust.

## THIRD CAUSE OF ACTION

### Breach of Contract/Damages

### (Against WMC and EquiFirst)

50.     The Trustee incorporates by reference the allegations set forth in paragraphs 1 through 49 inclusive, of this Complaint as though set forth fully herein.

51.     WMC and EquiFirst have breached their contractual obligations under the PSA, the Purchase Agreements and the Assignment Agreements to cure and/or repurchase the Defective Loans.  The PSA, the Purchase Agreements and the Assignment

Agreements are valid and enforceable contracts that give rise to certain obligations on the part of WMC and EquiFirst with respect to the Mortgage Loans.

52.     On or about August 27, 2010, in accordance with § 2.03 of the PSA, Wells Fargo notified the Trustee of the breaches of WMC and EquiFirst's representations and warranties that materially adversely affect the value of the Mortgage Loans and the Certificates, thereby triggering the ninety (90) day cure period provided by § 2.03.

53.     Over ninety (90) days have passed since WMC and EquiFirst were notified of their breaches.  As of the date of this filing, WMC and EquiFirst have failed and refused, and continue to fail and refuse, to perform their obligations under the PSA − in particular, to repurchase the Defective Loans and cure missing or defective documentation.  The Trustee has adequate notice of these failures to repurchase.

54.     The Trustee has performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the subject contracts.

55.     As noted above, the Trustee, acting on behalf of the Trust, is entitled to specific performance of WMC and EquiFirst's obligations under the PSA, the Purchase Agreement and the Assignment Agreement to repurchase the Defective Loans identified by Recovco, as well as the rest of the non-conforming Mortgage Loans.  However, if specific performance is for any reason not available (for example, where a loan has been liquidated and is no longer available for repurchase), then the Trustee is entitled to recover damages for the losses caused to the Trust by WMC and EquiFirst's conduct, which damages likely exceed $200 million.

## **PRAYER FOR RELIEF**

WHEREFORE, judgment should be entered in favor of Plaintiff and against the

Defendants as follows:

(a)      On the first cause of action, for the specific performance of WMC and

EquiFirst's obligations under the PSA, the Purchase Agreements and the Assignment

Agreements to repurchase the Defective Loans, as well as all other non-conforming

Mortgage Loans;

(b)      On the second cause of action, an order declaring that WMC and EquiFirst

are obligated to repurchase the Defective Loans, as well as all other non-conforming

Mortgage Loans;

(c)      On the third cause of action, an award of damages against WMC and

EquiFirst for compensatory damages in an amount to be determined at trial but likely in

excess of $200 million;

(d)      For prejudgment interest at the maximum legal rate; and

(e)      For any such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

Dated: September 2, 2011

### MASLON EDELMAN BORMAN   & BRAND, LLP


By:   s/ Justin H. Perl
      Justin H. Perl (#151397)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
(612) 672-8200
justin.perl@maslon.com

### KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marc E. Kasowitz (mkasowitz@kasowitz.com)
Michael M. Fay (mfay@kasowitz.com)
Uri A. Itkin (uitkin@kasowitz.com)
1633 Broadway
New York, NY  10019
(212) 506-1700

Attorneys for Plaintiff MASTR Asset Backed Securities
Trust 2006-HE3, by U.S. Bank National Association, as
Trustee